Our next case for argument this morning is the Equal Employment Opportunity Commission v. Wal-Mart Stores East. Mr. Setlin. Thank you, Your Honor. Misha Setlin for Wal-Mart. It's a pleasure to be here with you this morning. After Wal-Mart's new scheduling system began scheduling Ms. Spaeth to work from 1 p.m. to 5.30 p.m. instead of noon to 4 p.m. as had been the case before, Ms. Spaeth's attendance issues worsened substantially. This continued even after Wal-Mart gave Ms. Spaeth multiple coaching sessions and also gave her multiple months to correct her attendance issues. Mr. Setlin, time is kind of, you know, short, so I'm going to start you right off if you don't mind. Thank you, Your Honor. Why aren't Stephenson's, Ms. Stephenson's two interventions on her sister's behalf enough to indicate to Wal-Mart that a schedule accommodation was medically necessary? As I understand it, Ms. Stephenson expressly drew a connection between Spaeth's Down syndrome and her inability to work the new schedule. So wasn't that enough to suggest that there was a medical need for an accommodation? Just as if an employee said something like, my doctor tells me I shouldn't lift more than 10 pounds. Well, Wal-Mart could have been within its rights to follow up, ask for confirmation from a doctor. But why was the company not bound by a duty of inquiry at this point? Your Honor, I have a factual answer and an illegal one, and they're two separate independent bases. With regard to the factual one, Ms. Stephenson said that there were three problems with this new schedule. One, Ms. Spaeth was getting too hot. Two, that she wasn't able to eat when she wanted. And three was that she was missing her preferred bus home. None of those are medically necessary, or she did not attempt to medically link them to her Down syndrome. Now, when she did reference Down syndrome later, she did say, oh, it's because she's getting too hot. But EEOC did not argue to the jury that people with Down syndrome, if they have to work an hour later or 30 minutes more, get too hot. So if they had put on that kind of evidence and they had submitted that to the jury, maybe that question would be apt. But the only link that Ms. Stephenson gave between when she mentioned Down syndrome and the three problems that she had highlighted with regard to this new schedule was this too hot thing. And that just wasn't an argument that EEOC made with regard to a medical link to Down syndrome at trial. What they did at trial, Your Honor, is they brought in their expert to argue this groove theory. And this groove theory is this theory that apparently folks with Down syndrome have trouble adjusting to change. Now, this is a theory that even though an expert said that most people in the medical community don't know about, and certainly Walmart's retail associates and their supervisors wouldn't know about. So that's my factual answer, and I think that's enough itself to require judgment in our favor. But now the legal answer is that the term medically necessary, which is in the jurisdiction that EEOC agreed to, is spelled out in this court's case law, and it's most particular in this court's extract case. And the way that an employee or an agent speaking for them, which we have no problem saying her sister is here, conveys medical necessity with regard to a non-obvious accommodation request is you provide a doctor's note or orally relay what your doctor said. And, of course, that makes a whole lot of sense because if it's a non-obvious condition... Now, is there anything in the statute that requires a note from a physician as opposed to a notice from a relative? There is nothing in the statute, Your Honor. Anything in the regulations that requires a note from a physician? Not that I know of. All right. Well, then why wasn't what Stevenson said sufficient? I understand the point of your brief, that even most physicians would not understand this particular limitation of somebody who suffers from Down syndrome. But a jury could think that Walmart understood it, having been alerted by Stevenson. And if there isn't any requirement that there be a doctor's note to go with it, what's missing? Well, the jury instructions say that the statement had to be that this was medically necessary. The last time I was here in the Walmart case, there was a lot of... Is that some kind of magic words argument? No, that's the jury instruction that they agreed to. And also, Your Honor, that jury instruction comes from... I'm asking whether you're making a magic words argument that Stevenson had to use particular words. Absolutely not, Your Honor. Okay. Then what's missing as a matter of law in what Stevenson said? The matter of law is that she did not link it to any medical issue with Down syndrome. The only medical link... The jury instructions say medically necessary, and those come from this court's case law. But isn't that triggered after the interactive process? Not at all, Your Honor. And I think the key case here is X-Strand, and I think that case is exactly on point. And if I may for a second, I think it will... And in that, I think you're going to pull out the language, an employer is not required to accommodate an employee who refuses to hand over medical documentation. No, Your Honor, that was not what I was going to do. I was going to talk about what happened in X-Strand and this court's holding, and I think it clarifies. That's the language from X-Strand, what I just read to you. Well, I was going to discuss the holding of X-Strand. And the holding just provided it. The employee never provided the employer with evidence other than conclusory remarks after the interactive process had began. There was an interactive process, that's true, but what this court held is that the employer there, the school, had no obligation under the ADA until the employee, the schoolteacher there, provided a medical note. And what happened was the sequence was important. In September, the teacher lets the school district know, I've got seasonal affective disorder, but provides absolutely no note or medical basis or doctor's orally-related conclusion that because... For 15 years, Walmart has worked with this individual. Right. For 15 years, okay? So that distinguishes X-Strand from this case. For 15 years, they've worked with an individual that they know has Down syndrome. This individual, when her schedule is changed, comes to Walmart and says, I need to go back to my old schedule, in essence. And there's plenty of language within the Seventh Circuit that defines for an employer that the individual might not be able to give or exact, right, to be able to make the connection. But where or when? Because the jury found differently as to Walmart's responsibility to begin the interactive process. Our position is under X-Strand. We did not have an obligation to begin the interactive process until we provided medical information. Now, it wasn't that we were just told, you know, by her or her sister that, you know, I need a new schedule and this is Down syndrome. We were told three specific things. I mean, this wasn't like, and we were told the same thing by Ms. Spaeth and the same thing by her sister. One, that she's getting too hot. Two, that she wants to eat earlier. And three, that she wants to take the earlier bus. I believe that when, you know, when they talk about her being too hot, the intimation is upset. But, I mean, I, look, the jury could certainly have seen Walmart's way and concluded that it was an honest mistake, but they didn't. They looked at the evidence and they found that Walmart was at the very least recklessly indifferent to her rights as someone they knew was a disabled employee. Fifteen years as, you know, my colleague has noted to you. I don't see how we could say the evidence did not reasonably support that decision, especially when the company never engaged in an evaluation of whether a scheduled accommodation would be feasible, despite an understanding by at least some of your managers. This is what she's asking for. So it is a problem here. Your Honor, I'm certainly not trying to avoid the fact that we are trying to overturn a jury verdict and we have a high burden in that circumstance. Certainly do not dispute that. It is a high burden on us. We did lose at the trial. But this is, what we were told is not in dispute. Said that she was getting too hot, wasn't able to eat when she wanted, wasn't catching a preferred bus home. This could certainly happen with any number of folks who are not disabled who really like their old schedule. But she also told, Ms. Stevenson also said she has Down syndrome. Right, and then she said, right after that, she said that she couldn't physically handle working, that she was getting too hot. She said she couldn't physically handle working that late. That's the transcript. Right, Your Honor. At 4515 through 4812. Absolutely. So it's important not to cut off the conversation. Absolutely, Your Honor. And I apologize if that's what I was doing there. But my point, and if EEOC at trial had put on some evidence that said, yes, you work that late, it's too hot. That's a problem for folks with Down syndrome in general. Aren't you reverting the burdens here? I mean, you know, Dr. Smith talked about her distress and depression. Ms. Stevenson's testimony. I mean, what more is the EEOC required to offer? As Judge Pryor pointed out, the link that her sister made between the mention of Down syndrome and the challenge she was having was this too hot thing. If EEOC had put on any evidence at trial or had presented to the jury this theory that she needed an accommodation because she was getting too hot, then you would have a different case. That is not at all the theory they put on. They put on a completely different theory. They put on this groove theory. And a jury's verdict can't be upheld on a basis that wasn't argued to it. They put on this groove theory. And the groove theory was conceded by their very expert. The only medical expert at trial is not known even in the medical community. What they say in their response brief, well, look, it's known to a specialized cohort of doctors that work with folks down syndrome. We have no truck with that. And if we had been given a note or even an oral relaying of this groove theory by Ms. Stevenson in these conversations, we would have taken a different approach. But that's not what happened. All the things she said was it's too hot, wants to eat earlier, wants to take the bus home. And that is not at all the groove theory. And she also said I can't at this schedule. I want my schedule changed. Yes, Your Honor, and certainly that is consistent with any able-bodied employee wanting to go back to what they were doing. And that's why the medical necessity jury instruction and this court's case law is so important. We can't assume. Lots of employees were very unhappy about this new automated schedule change because they've gotten used to the way of doing business. We can't assume that someone that's disabled, all the problems that they might have in the workplace are related to that. Now, if I could reserve the balance of my time, I would greatly appreciate it. Yes, but I do have one quick question. Does the record tell us what steps, if any, Walmart has taken to correct the apparent misunderstanding on the part of some of its managers that long-term schedule modifications are not permissible as a means of accommodating an employer's disability? Certainly the written policies allow for long-term accommodations, including schedule changes. Thank you. So why was Stevenson told that that was absolutely impossible? Well, so what was said was impossible. We are essentially getting into the cross-appeal issue in which the EEOC wants an injunction, particularly an injunction against implementing the policy the way it was apparently implemented in this case. Well, Your Honor, with respect, it wasn't implemented in this case in that way because she never even got through the threshold of getting any accommodation because we didn't see her as requesting any sort of accommodation. That's what happened here. Now, with regard to the somewhat conflicting testimony of some of our employees, that is a separate issue. But with regard to how she was treated, she never got to that point in the process because that's not how we were treating her request. Okay. Thank you, Mr. Setlin. Ms. Shetland. Good morning, Your Honors. Chelsea Shetland for the EEOC. I'd like to begin where you started with Mr. Setlin with respect to the express accommodation request that Stevenson made. I just want to point out that Mr. Setlin tries to frame these as though they were discrete occurrences and issues that had nothing to do with Ms. Bates' difficulty adjusting to the routine, what Ms. Stevenson invoked. Yet these are all manifestations of her difficulty adjusting to routine. Ms. Stevenson said because she has Down syndrome, she's having specific difficulties. There were physical difficulties adjusting to the routine that was getting too hot and physically being unable to handle working that late. There were also everyday and ordinary difficulties adjusting, like missing her bus due to confusion about the schedule and not being able to get home in time for her dinner that she usually had with her stepsister. So to frame these as though they are completely separate from the limitations that were argued at trial as incorrect. I'd also point out that Ms. Stevenson did explain that getting too hot, becoming confused, needing to have a specific schedule were related to the Down syndrome, and that evidence was presented to the jury. I'd also just briefly like to address the point about this course decision in Ekstrand. The reason that that case is distinguishable is it dealt with the employer's duty to actually provide a requested accommodation after the interactive process had already begun. The employer in that case had been engaged in the interactive process for months. It had already provided a number of accommodations to the employee. And the issue, this court reasonably said, was that how was the employer to know that this specific accommodation, as opposed to the others that the employer had already provided, was medically necessary and was the key to her improvement if they did not have a doctor's note. But here Walmart simply disregarded the accommodation request entirely, never engaged in the interactive process, and so never got to the step where it might have sought corroboration to determine whether this particular accommodation, as opposed to another, was necessary to address Ms. Space's Down syndrome. Now I'd like to turn... I take it from your brief, and from what I guess you just said, that if Walmart had asked the Space family to provide a letter from a physician confirming that due to her Down syndrome she needed a schedule accommodation, the family would have been obligated to supply it. And your point, I take it, is that Walmart had a duty to inquire and to ask for such medical corroboration as part of the interactive process. But that never took place. So that's what we're left with. Precisely, Your Honor. And if there is a business necessity to request that corroboration, if it's not obvious of the medical necessity of the accommodation, then of course Walmart would have been able to ask for that as part of the interactive process, but that's not what's in here. If there aren't any further questions about this issue, I'd like to turn to the cross-appeal, but I'm happy to... It wasn't addressed a moment ago about the punitive damages award and abuse of discretion on the compensatory damages. I don't know if that's something that you wanted to address before you talk through your cross-appeal. Sure, Your Honor. With respect to punitive damages, the entirety of Walmart's argument rests on the notion that this was simply an honest mistake and that it didn't know that Ms. Faith needed an accommodation. And the jury soundly rejected that theory of the case and found that Walmart knew that she needed an accommodation and nonetheless refused that accommodation, terminated her, and then refused to reinstate her. Based on that set of facts, Walmart does not even really attempt to dispute that this would be a case of reckless disregard rather than mere negligence. Turning to compensatory damages, there's no basis to disturb the district court's determination that this was a proper compensatory damages award, not to remit that award. The jury heard poignant testimony from Ms. Faith's relatives, from Ms. Faith herself, from her physician, about the depression and distress that were caused by her termination from Walmart, and all Walmart says is this was extremely brief and limited testimony. But they don't explain why that detailed testimony can be characterized in that manner. Turning to the Cross Appeal, Your Honor, the district court abuses discretion here because it ignored relevant evidence of the likelihood of recurrence and it also committed legal error. But I'd like to begin with the relevant evidence of likelihood of recurrence. Here there was ample testimony from senior Walmart... I'm much less concerned about evidence... Yes, sir. ...than about what the EEOC was requesting. Yes. The district judge understood the agency to be asking for a general obey the law instruction. Yes, Your Honor. Injunction. Was that a correct understanding of what the agency was then asking for? No, Your Honor. There was one provision... Did the agency give a list of potential directives that would be beyond just obey the law? Yes, Your Honor. We had 12 specific enumerated requests and we're pursuing eight of those on appeal. All of them, with the exception of request number three, were discrete measures such as training, correction of policies, adding incentives for Walmart managers to comply with certain internal policies that didn't simply require Walmart to obey the law. It didn't say Walmart must comply with the ADA. It said Walmart should take these discrete measures and the idea is to ensure compliance with the ADA, but they're more granular, discrete measures. The district court did not explain why the court lumped together all of these measures as, quote, for the most part directives that Walmart comply with the law. But the district court did subject all of those measures. Did he pull apart a little bit, though, looking at those eight measures that we're talking through on appeal, the judge did provide some guidance in regards to the training that you're requesting it's already something that Walmart does. The training for the particular managers at this store, they have annual training on ADA policies, procedures. The facts of this case, that it happened to this particular employee, doesn't demonstrate that it was widespread. And so beyond the finding that the majority of these requests were kind of obey the law, doesn't he give us, though, some additional reasons for why he denied the injunction of request? I have two responses to that, Your Honor. The first is that the notion that these were obey the law measures infected the entirety of the reasoning because it led to reversing the burden for EEOC to show that the voluntary, the conduct could not possibly be resumed, whereas that burden falls on Walmart, of course, to demonstrate that the illegal conduct could not possibly persist. But are we taking that quote out of context? I don't think so, Your Honor. And it's true that the district court correctly stated the legal test but then proceeded to apply it in a way where it criticized EEOC's purported failure to meet its burden while not even identifying any burden that Walmart itself had discharged. With respect to the policies and trainings, I just want to point out that there are only two policies that the district court cited that have anything to do with the ADA's reasonable accommodation mandate. These are the precise policies that Mr. Spudi was shown on the stand. He read them on the stand to himself and testified that they only contemplate short-term schedule accommodations and not long-term schedule accommodations. So clearly there's a lack of understanding. Mr. Spudi is a regional director. He oversees more than 100 stores, more than 30,000 employees. Clearly whatever training and policies are in place are not sufficient to allow Walmart managers to understand that those accommodations are contemplated by the ADA. Your Honor, I would just point out also that below, Walmart took the litigation position that it was not required to provide permanent schedule accommodations. As a matter of course, as a categorical matter, it asserted in its closing that the idea that we're going to provide someone with a permanent schedule accommodation is not something that we do. And now Walmart is backing off from that position. But that's what it argued to the jury. And in fact, the district court criticized Walmart for taking this position saying that the idea that there's never a need for a schedule accommodation flies in the face of the relevant regulations, which is correct. I'd also just point out that this court's decision in Brussaux reversed a district court's denial of injunctive relief where the issue was that the district court had relied on the mere existence of formal policies without considering whether there was evidence of noncompliance in practice. And in that case, the only evidence of noncompliance in practice was simply that the managers had not complied in the past with the policy. But here we have even more than that. We have senior Walmart managers on the stand asserting that they understand the policies to actually prohibit the ability to provide a permanent or a long-term schedule accommodation. So there's additional evidence that these policies are not being implemented in the manner that Walmart is claiming they're intended to be implemented. I also just want to point—I'm sorry, Your Honor. Were you going to say something? Sorry. Just turning, Your Honors, to the geographic scope of the injunction, the district court did mention that it believed this to be a unique incident involving only one store, but the evidence, of course, shows that there was the involvement of national-level managers— a national-level manager, Denise Morgan, who is located at the corporate headquarters and of a regional director, Mr. Spudi. And that fact alone allows for the imposition of injunctive relief that extends beyond the store level. This court in AutoZone pointed to the fact that managers beyond the store were involved as a basis to affirm a region-wide injunction and said that the district court had appropriately crafted the geographic scope of the injunction because of the involvement of managers beyond the store level. I'd also just briefly like to discuss the concerns about paternalism that Walmart has raised here with respect to the point about awareness. And I think that it is odd to argue that it somehow promotes the dignity of disabled individuals to refuse to provide them with the opportunity to engage in the interactive process when they've expressly requested an accommodation. And this court rejected a similar argument in Sears, where it pointed out that the employer had said that it would be inappropriate to make assumptions about the employee in that case who walked with a limp. It would be inappropriate to assume that she had a disability just because she walked with a limp. And this court said, no, once an employee has raised a specific disability and raised the need for an accommodation, then the employer is, in fact, it's not only appropriate, but the employer is, in fact, required to engage in the interactive process with that employee because she has specifically asked for assistance. And that's what happened here. The NAP case that Walmart repeatedly cites about purported paternalistic concerns simply deals with paternalism involved in assuming that a given activity is too risky for a disabled individual. It certainly doesn't stand for the proposition that it's paternalistic to engage in the interactive process when an employee requests an accommodation. This must be about the 47th time you've used the phrase interactive process. Yes, Your Honor. Where do I find that in the statute? Your Honor, it's not in the statute. It's not there. It's not there, Your Honor. It's bureaucratic jargon for what is in the statute. And I, at least, would be happier if we talked about this statute in the terms used by the statute. I agree, Your Honor. Bureaucraties is always better. I understand. It has become a sort of judicial shorthand, but I do understand that that term doesn't appear in the statute directly. You're correct about that. If Your Honors have no further questions, I would ask that you affirm the jury's verdict in the award of punitive and compensatory damages but reverse the denial of injunctive relief and remand for the entry of an appropriate injunction. Thank you very much. Thank you. Mr. Setlin, anything further? Since you tried to take rebuttal time with about two minutes remaining, I will round you up to two minutes. Thank you, Your Honor. I appreciate it. Just briefly on the cross appeal, whereas I said to Judge Rovner that in overturning the jury verdict, we have a heavy burden, in overturning the district court's well-considered acquittal decision not toward injunctive relief, based upon the extremely broad request that they made, they have a very heavy burden. And while the term obey the law injunction is kind of a judicial shorthand, I mean if you take a look at what they actually asked the district court to do, they weren't trying to tailor the request to the store or to long-term scheduling changes. Each one of these requests basically involves broad, either nationwide or regionwide receivership essentially of Walmart, based on what I think it was fairly characterized as a close case where we had a fair disagreement about whether what she was asking for was a reasonable accommodation, basically medically necessary, or was something where we made a mistake. I understand you would have a better argument if the district judge had said something like that, but the judge didn't. What the judge said is they're just asking for an obey the law injunction, and that's not appropriate. Well, they have asked for more than that. One of their requests, just to be concrete, is Walmart can no longer assert that it never makes long-term schedule adjustments as an accommodation. That's one injunction that the judge could enter, and I didn't see the judge discussing that possibility at all. Your Honor, I might be wrong, but I do not believe that was one of their requests. What their requests were, much broader, on a regional or a nationwide level, is that we can't deny any long-term accommodations if not tailored to schedule. Now look, they decided to go for the home run. They decided to ask not for store-wide like they tried to do. I'm sorry, that's not accurate. It says the number six, require Walmart to provide training to its managers and supervisors regarding the obligation to grant schedule accommodations under the ADA in the absence of undue hardship and to remind them that a request for a schedule accommodation from a person with a disability cannot be denied at the store level. Yes, so that's the only one of those that read first schedule, and it doesn't talk about the long-term aspect. And so, you know, they can try to amend that. Look, I understand that you might disagree with some of the language, but my concern, and perhaps that of my colleagues, is that the district judge never got into the nitty-gritty of this. District judge at a very high level says, well, they're just seeking obey the law relief, denied. And the kind of discussion we are having here doesn't seem to have happened in the district court. Well, Your Honor, as a threshold matter, Justice Griesbach did say that we satisfied our burden, that this conduct was not likely to recur again. So his discussion of obey the law injunctions was only a backup second conclusion, and that first conclusion is entitled to very substantial deference and that they have a very heavy burden to overturn. You know, I think it would be somewhat of a problem to write off all seven of the injunctions requested as obey the law injunctions, particularly where, for instance, number four, number six, which relate to work schedule accommodations and relate specifically to the type of misconduct that the jury found Walmart committed in this case. And they are aimed at preventing a recurrence. And then number four, well, that would be number six, I guess. And number four, which simply requires that Walmart notify its employees of the verdict in this case and remind them of their right to contact the EEOC without being fearful of any retaliation. I mean, it seems that that's a relatively straightforward demand that doesn't require ongoing supervision by the court. So those two I do worry about. So certainly number four is the least onerous one of the requests that they make and the only one tied really to the facts that were found by the jury. The rest of them, while they can either be characterized as a true obey the law or implicate the exact same concerns as obey the law, which is you word it so broadly so the EEOC doesn't have to bring a lawsuit and can just bring a contempt motion, it really triggers the same concerns as obey the law injunctions. All right. Thank you very much, counsel. The case is taken under advisement, and the court will take a ten-minute recess before calling the third case.